Sunil A. Brahmbhatt, Esq. (SBN. 140484)
Law Office of Sunil A. Brahmbhatt, PLC.
2700 N. Main Street, Suite #310
Santa Ana, CA 92705
Tel: 714-285-1092 * Fax: 714-917-3130
sunillaw@yahoo.com

Attorney for Plaintiff
THINK20 LABS LLC., a Delaware Limited
Liability Company qualified
to do business in California

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| THINK20 LABS LLC., a Delaware Limited Liability Company qualified to do business in California<br><br>　　　　　Plaintiff,<br><br>Vs.<br><br>PERKINELMER HEALTH SCIENCES, INC., a Delaware corporation,<br><br>　　　　　Defendants. | **Case No:**<br><br><br>**COMPLAINT FOR DAMAGES:**<br><br>**(1)** Fraud & Deceit-Intentional Misrepresentation<br>**(2)** Fraud & Deceit-Negligent Misrepresentation<br>**(3)** Fraud & Deceit-Suppression of Facts<br>**(4)** Breach of Implied Warranty of Merchantability<br>**(5)** Breach of Warranty of Fitness for A Particular Purpose<br>**(6)** Recission and Restitution<br><br><br>**Demand for Trial by Jury**<br>**F.R.C.P. Rule 38(b)** |

Plaintiff  THINK20 LABS LLC., a Delaware Limited Liability Company qualified to do business in California alleges as follows:

## JURISDICTION AND VENUE

**1)**   This court has jurisdiction pursuant to 28 U.S.C. §1332 on the grounds that there is complete diversity of citizenship between Plaintiff THINK20 LABS LLC., which has its established principal place of business in the State of California, and defendant PERKINELMER HEALTH SCIENCES INC., is a Delaware corporation with its principal place of business located at, 940 Winter Street, in the City of Waltham, Massachusetts 02451 and the amount of controversy in this action exceeds $75,000.00, exclusive of cost and fees.

**2)**   Plaintiff is informed and believes and thereon alleges that, venue over the claims alleges in this Complaint is proper in this Court under 28 U.S.C. § 1391(b) because Plaintiff THINK20 LABS LLC resides in and has its principal office in and operates its business in the city of Irvine, County of Orange, State of California and is within this judicial district.

## THE PARTIES

**3)**   Plaintiff THINK20 LABS LLC., (hereinafter referred to as, "THINK20") is a Limited Liability Company organized and existing under the laws of the state of the state of Delaware and is qualified to do business in California with its principal office established at, 3 Mason, Suite #100, in the city of Irvine, County of Orange, State of California.

**4)**   Plaintiff THINK20 is informed and believes and thereupon alleges that, at all times mentioned herein, Defendant PerkinElmer Health Sciences, Inc., (hereinafter referred to as, "PERKINELMER") is a Corporation organized and existing under the laws of the state of the state of Delaware with its principal office located in Massachusetts. PERKINELEMER is the manufacturer of Laboratory Testing Instruments marketing and selling its

Laboratory Testing Instruments for regulatory compliance testing of cannabis in California and throughout United States with sales, service and support staff established in the state of California.

5) Plaintiff THINK20 is informed and believes and thereupon alleges that, at all times mentioned herein, THINK20 does not know the true names and capacities of other Defendants, THINK20 will amend this Complaint to allege the true names and capacities of these unnamed and unknown, Defendants.

6) Plaintiff THINK20 is informed and believes and thereupon alleges that, at all times mentioned herein, PERKINELMER, and its Senior Management supervised and ratified each of the acts of each of its employees including those of Mark Greenbaum ("GREENBAUM") Tony Rhoden ("RHODEN"); Charlie Schmidt ("SCHMIDT") and Others, each of whom, were a part of the National Sales Team for PERKINELMER responsible for marketing, promotion & sales of Cannabis Testing Laboratory Instruments for regulatory compliance testing of cannabis in States within USA which has legalized marijuana for medical and/or recreational adult-use, including the state of California.

7) Plaintiff THINK20 is informed and believes and thereupon alleges that, at all times mentioned herein, that PERKINELMER Senior Management, along with GREENBAUM, RHODEN, SCHMIDT and others conspired with each other for personal financial gain in the form of bonuses commissions and other additional compensation and benefits in furtherance of this corporate conspiracy which has injured and cause financial injury to THINK20 as alleged in this Complaint. The alleged conspiracy was carried out by GREENBAUM, RHODEN, SCHMIDT and Others in concert with PERKINELMER Senior Management, their co-conspirators, through

deception, deceit, intentional and negligent, misrepresentations and suppression of facts regarding the performance and capabilities of the PERKINELMER'S Cannabis Testing Laboratory Instruments for regulatory compliance testing of cannabis in California as alleged herein.

8) In engaging in the afore-mentioned conduct, PERKINELMER Senior Management, DOE-DEFENDANTS, RHODEN, SCHMIDT and Others acted within the course and scope, of his, her, or their duty as PERKINELMER employee(s) in doing the things alleged to have been done as set forth in this Complaint and by acting within the course and scope of such agency or employment of Defendant PERKINELMER.

9) Plaintiff THINK20 is informed and believes and thereupon alleges that, at all times mentioned herein, the acts of each PERKINELMER Senior Management Personnel, GREENBAUM, RHODEN, SCHMIDT and Others, were authorized and/or ratified by each other, together such acts constitute a single continuing course of conduct. Furthermore, the acts of GREENBAUM, RHODEN, SCHMIDT, and Others were directed by an approved by Senior Management of PERKINELMER, all of which together constitutes a single continuing course of conduct.

### BACKGROUND FACTS COMMON
### FOR ALL CAUSES OF ACTIONS

10) Plaintiff-Complaint Defendant THINK20 is informed and believes and thereupon alleges that, in order to gain immediate penetration into the new emerging cannabis testing market in California and to obtain an advantage over its competitors and get an early foothold into California's emerging cannabis testing market, PERKINELMER through its Senior Management team along with employees GREENBAUM, RHODEN, SCHMIDT and Others, planned and schemed a pattern misrepresentations, deception, fraud, deceit and suppression of pertinent facts it was bound to disclose in the

marketing and promotion of its Cannabis Testing Laboratory Instruments for regulatory compliance testing of cannabis in California by prematurely releasing its Cannabis Testing Laboratory Instruments into the California marketplace as alleged herein.

**11)**   Plaintiff-Complaint Defendant THINK20 is informed and believes and thereupon alleges that, from early 2018, PERKINELMER began selling and marketing to the California market the following four (4) Cannabis Testing Laboratory Instruments: (i) Qsight 220 (i.e., Pesticides and Mycotoxins) while promoting the release of the Qsight 420 ("Qsight 420") for sale in early 2019; (ii) Flexar-HPLC (i.e. testing Potency of Cannabinoids)("HPLC"); (iii) NexION-2000B-ICP/MS (Testing Heavy Metals) ("ICP/MS"); and, (iv) Clarus SQ8-GC/MS (Testing Residual Solvents and Terpenes) ("GC-MS"). The four (4) instruments shall, from time to time, be collectively referred to as, "PE INSTRUMENTS".

**12)**   In or about July/August 2018, THINK20 was in the process of evaluating cannabis testing instruments for its two proposed cannabis testing laboratories, one in Maryland and a second lab in California. THINK20 was evaluating the purchase of Cannabis Testing Laboratory Instruments manufactured by PERKINELMER'S competitors, Agilent Technologies, and Shimadzu.

**13)**   The first meeting between THINK20 and PERKINELMER was at the Sheraton Shelter Island on August 14, 2018 between THINK20'S representative, Deiter Hofstetter ("DEITER") and the Senior Sales Specialist for Southern California for PERKINELMER, RHODEN.

**14)**   At this initial meeting, DEITER explained to RHODEN that THINK20 was in the process of evaluating Agilent Technologies, and Shimadzu's cannabis

testing laboratory instruments for opening two (2) labs, one in Maryland and a second one in Irvine, California.

15)   RHODEN informed DEITER that he would setup a formal meeting with his superior Mark Greenbaum, who was the head of the National Cannabis Sales Team to further discuss and formally present the PERKINELMER Cannabis Laboratory Instruments to DEITER.

16)   RHODEN setup a breakfast meeting for DEITER to meet with himself and his superior, Mark Greenbaum, head of the Cannabis Laboratory Testing Instruments National Sales Team, on August 16, 2018, at the Sheraton Shelter Island.

17)   At the August 16, 2018 meeting which lasted for approximately, one and a half hours, DIETER informed GREENBAUM and RHODEN that THINK20 was opening two (2) cannabis testing laboratories, one in Maryland and a second lab in Irvine, California. That, THINK20 was in the market to purchase cannabis laboratory testing instruments for its two new cannabis testing labs and was in the evaluation process of the laboratory instruments and favoring towards the purchase of Agilent Technologies laboratory instruments.

18)   During the August 16, 2018 breakfast meeting, RHODEN and GREENBAUM in order to convince DEITER and THINK20 to purchase the PE INSTRUMENTS over the Agilent Technologies Laboratory Instruments. PERKINELMER through RHODEN and GREENBAUM introduced each of the PE INSTRUMENTS to DEITER and made the following representations in order to convince DEITER and THINK20 to purchase PERKINELMER'S Cannabis Testing Laboratory Instruments as follows;

a) RHODEN started the meeting by stressing to DEITER that, the PERKINELMER cannabis laboratory instruments are designed to be a

plug and play turn-key operation solution for the cannabis testing instruments, which are easy to operate in order to keep costs of operation low. GREENBAUM stressed that the operation of the instruments was so simple that a lab technician with zero to minimal experience could operate each of the PE INSTRUMENTS.

**b)** GREENBAUM And RHODEN reiterated and stressed the point that, all PE INSTRUMENTS provide fully developed Methods and complete standardized SOP's for each California solution (i.e., PE INSTRUMENTS) and met California's stringent regulatory guidelines for compliance testing of cannabis.

**c)** RHODEN specifically spoke the words to DEITER that, *"No other vendor has complete & supported SOP's & Methods for cannabis on all instrumentation"* and GREENBAUM added, *"No other vender provides the support we do for cannabis."* During the meeting, these two statements were repeatedly conveyed to DEITER by both RHODEN and GREENBAUM.

**d)** RHODEN and GREENBAUM both concurred with each other by making the representations that, PERKINELEMER'S fully developed Methods, and complete SOP's are ideal for THINK20 to setup a cannabis testing laboratory quickly and efficiently with ease, for immediate validation for each solution (i.e., PE INSTRUMENTS) in compliance with the stringent regulations and requirements of the California Bureau of Cannabis Control ("BCC"). RHODEN further pointed out that the PE INSTRUMENT solution will save time and money in the preparation of the validation package(s) as compared to its competitors.

#

#

**e)** RHODEN further represented that the validation process for the PE INSTRUMENTS can be completed with ease within two (2) months of installation of the PE INSTRUMENTS.

**f)** GREENBAUM concurred with RHODEN and further represented by stressing the point that because the PE INSTRUMENTS had fully developed SOP'S which were provided with each instrument, THINK20 would save substantial time in speeding up the validating process for each of the instruments resulting in THINK20 quickly submitting its validation package(s) for each instrument to the BCC.

**g)** It was further stressed by GREENBAUM that the quick validation process would resulting in the laboratory being operational for testing with the ability to generate revenue quicker than if THINK20 purchased its competitor's instruments.

**h)** RHODEN and GREENBAUM further represented that since THINK20 was opening two (2) labs, with PERKINELMER'S fully developed methods for each instrument, the Method used in Maryland would be the same as the Irvine lab, for each instrument which could be easily copied and replicated thus, creating a *"Global Method"* across all of the PE INSTRUMENTS.

**i)** GREENBAUM touted and stressed and RHODEN concurred to DEITER that, PERKINELMER had superior Technical Support and Service than its competitors, Agilent, and Shimadzu.

**j)** It was repeatedly stated by both RHODEN and GREENBAUM that, PERKINELMER was quick and efficient in providing Service and Support to its customers as PERKINELMER had full coverage across the United States to support the PE INSTRUMENTS.

**k)** GREENBAUM further represented that the average time for a PERKINELMER Service Engineer to be on-site was 24 hours to 48 hours and further stressed that if parts were required, they could be ordered immediately and overnighted for any of the PE INSTRUMENTS to minimize instrument down time and ensure that the instrument would be back online within 24 hours;

**19)** Also, during the 8/16/20198 breakfast meeting, DEITER provided GREENBAUM and RHODEN with THINK20'S revenue proforma and plan which THINK20 was preparing for its investors based on Agilent's throughput of tests.

**20)** Immediately upon reviewing the THINK20 proforma, both GREENBAUM immediately stated to DEITER that THINK20 income and throughput of the instruments in the proforma was understated and if THINK20 purchased PE INSTRUMENTS the revenues should be substantially increased based on the higher throughput of the PE INSTRUMENTS.

**21)** To support their representations above, RHODEN pulled out paperwork and stated that the throughput for the PE INSTRUMENTS for a 24-hour period was as follows: (i) the Qsight 220 (Pesticides) has a throughput of 60 samples/vials (i.e., tests); (ii) the NexION-2000B (Heavy Metals) has a throughput of 288 sample/vials; (iii) the Flexar-HPLC(Potency Cannabinoids) has a throughput of 131 sample/vials and, (iv) the Clarus SQ8 (Residual Solvents/Terpenes) has a throughput of 144 sample/vials.

**22)** GREENBAUM and RHODEN further stated to DEITER that THINK20 can reasonably rely on the PERKINELMER throughput to update his ROI proforma revenue model for its investors THINK20 purchased PE INSRUMENTS.

#

**23)**   RHODEN, in looking at his paperwork, further explained to DEITER that PERKINELMER had prepared a simple proforma ROI Gross Revenue Model based on its PE INSTRUMENT package. Rhoden stated that based on an average of 400 samples a month with all the PE INSTRUMENTS a lab would easily generate gross revenue of $250,000.00 per month.

**24)**   GREENBAUM repeated again that THINK20 can show greater return on investment to its investors by purchasing the PE INSTRUMENTS.

**25)**   DEITER requested a copy of the paperwork from which RHODEN provided the throughput and revenue information and RHODEN indicated that he would provide it at a later date to THINK20.

**26)**   After the August 16, 2018 breakfast meeting with PERKINELEMER (i.e., RHODEN and GREENBAUM) DEITER reported to THINK20's Lab team the discussion and representations, as made by RHODEN and GREENBAUM as set forth in paragraphs 18(a) through (k) through Paragraph 23, hereinabove, and incorporated herein in their entirety by this reference.

**27)**   On August 22, 2018, GREENBAUM arranged for a conference call between DEITER and Benjamin Orsburn ("BEN") from THINK20's Technical Lab Team and Erasmus Codjoe ("ERASMUS") the PERKINELEMER Scientist who was knowledgeable with the SOP's for the Qsight 220 (i.e., Pesticide and mycotoxins) to alleviate any apprehensions DEITER might have regarding the fully developed method and SOP for the Qsight 220 and the throughput previously represented by GREENBAUM and RHODEN.

**28)**   On August 24, 2018, a conference occurred between PERKINELMER and THINK20, ERASMUS, RHODEN, GREENBAUM on behalf of PERKINELMER and DEITER and BEN on behalf of THINK20. During the conference call, ERASMUS represented and confirmed to DEITER and

BEN that Qsight 220 and all the Methods and SOP's have been fully developed and confirmed the throughput of 60 sample/vials per 24-hour period.

29) ERASMUS further represented that, Qsight 220 was able to meet the stringent California BCC regulations and confirmed the representations set forth hereinabove in paragraphs 18(a) through (k) to paragraph 22, each of which are incorporated herein, in their entirety by this reference.

30) Thereafter, RHODEN invited DEITER of THINK20 to the Cannabis Science Conference which was held in Portland, Oregon, August 28 & 29, 2018 ("OREGON CONFERENCE") to meet with himself, GREENBAUM and Charlie Schmidt ("SCHMIDT") another member of the PERKINELMER Cannabis Laboratory Testing Instruments National Sales Team.

31) On August 27, 2018, DEITER flew to Portland and attended the OREGON CONFERENCE and on August 28th & 29th DEITER met with GREENBAUM, RHODEN and SCHMIDT, who was intimately familiar with the Qsight 220.

32) In discussions with SCHMIDT during the OREGON CONFERENCE SCHMIDT re-iterate and re-confirmed each of the same representations made regarding the PE INSTRUMENTS by RHODEN and GREENBAUM on August 16, 2018, specifically those representations set forth in paragraph 18 (a) through (k), each of which are incorporated herein by this reference.

33) Also, at the OREGON CONFEENCE, GREENBAUM introduced DEITER to David Vissing ("DAVID") of Indigo BioAutomation ("INDIGO"). INDIGO had a software product called *'Ascent'* which was software system to fully automate chromatography and MS quantitative analysis.

**34)** GREENBAUM indicated to DEITER that the Ascent software would be integrated for all PE INSTRUMENTS and DAVID was in the process of working on the automation.

**35)** On or about September 11, 2018, RHODEN sent an Email and invited DEITER to the '*Cannabis Science Conference'* held in Oakland, California from September 20, 2018.

**36)** DEITER along with Sergy Latyshev ("SERGY") from THINK20 attended the September 20, 2018 one-day seminar hosted by PERKINELMER in Oakland, California.

**37)** The Pesticides presentations was being presented by GREENBAUM and was attended by DEITER and SERGY. Pertinent pages of the PowerPoint presentation by GREENBAUM are attached hereto as Exhibit "1" and incorporated herein by this reference. During the PowerPoint presentation the following specific representations from the PowerPoint regarding the Qsight 220 which stressed in detail two (2) key points of the many representations made during the presentation as follows;

    **a)** Exhibit 2- Page 9, *"Plug-In Ready Cannabis Pesticide SOP: Fast start up, start to finish".*

    **b)** Exhibit 2- Page 10, *"Validated method that meets all action limits (LOQ) required for pesticides and mycotoxins".*

**38)** Additionally, during the Oakland Seminar on September 20, 2018, DEITER and SERGY attended another presentation presented by PERKINELMER Senior Field Application Specialist, Tom Kwoka ("KWOKA") entitled, '*Fast Terpene and Residual Solvents Analysis by Headspace GC/MS'.* A copy of the pertinent pages of the PowerPoint presentation are attached hereto as Exhibit "2" and incorporated herein by this reference.

**39)**   KWOKA'S presentation made several representations regarding the Clarus SQ8 instrument for testing residual solvents and terpenes and specifically represented as follows:

**a)**   that, the Clarus *was, 'Precise, Accurate, easy to use based on a simple Sample Prep method for optimizing profits for quicker release of the results due to a combination method allowing both Residual Solvents and Terpenes applications are analyzed on a single configuration'.* (Ref. Exhibit 3-Page 7);

**b)**   that, the Clarus had a '*predetermined Turnkey method'* (Ref. Exhibit 3-Page 9);

**c)**   that, the Clarus provides, *'the quickest, easiest solution without sacrificing analytical performance such as accuracy and precision; combining Residual Solvent and Terpene measuring in one run making the analysis short'; 'Providing instrumentation with the BEST reliability in running samples without incurring down time' ; Providing a turnkey solution so that when the service engineer completes the installation, samples can be run immediately';* (Ref. Exhibit 3-Page 16);

**d)**   that, the Clarus application provides for *Residual Solvents sample run time to be 7.5 minutes'* (Ref. Exhibit 3-Page 18); *'Terpenes sample run time to be 8.1 minutes'* (Ref. Exhibit 3-Page 19);

**e)**   that, PERKINELMER has, *'one analysis: Turnkey Solutions with SOP'S'* (Ref. Exhibit 3-Page 20);

**f)**   that, PERKINELEMER has a *'One Run, Single Turnkey Solution'* so that both applications for *Residual Solvents and Terpenes can run together in a Combination Method separating 38 terpenes in less than 13 minutes'* (Ref. Exhibit 3-Page 21);

**g)** that, the Clarus application sample prep is for, *'Extract oil; leaves, flower, and edibles'* (Ref. Exhibit 3-Page 23);

**h)** that, the Clarus application was a *'Turnkey solution which was fast, easy, accurate and precise which was also reliable for more uptime to run more samples to optimize profits'* and that, teaming with PERKINELMER was a '*partnership for success'* (Ref. Exhibit 3-Page 24).

**40)** Additionally, at the Oakland Seminar on September 20, 2018, DEITER and SERGY attended a third presentation presented by Aaron Hineman, ("HINEMAN") Inorganic Product Line Leader for the America's for PERKINELMER Senior Field Application Specialist, entitled, '*Analyzing Cannabis and Related Products for Heavy Metals'*. A copy of the pertinent pages of the representations made by HINEMAN in the PowerPoint presentation are attached hereto as Exhibit "3" and incorporated herein by this reference.

**41)** HINEMAN'S presentation made several representations regarding the NexION ICP-MS instrument for testing Heavy Metals and specifically represented as follows:

**a)** that, for the NexION ICP-MS PERKINELMER had fully developed SOP's with '*an analytical method setup for setting up a run'* (*Exhibit 3-Page 5*);

**b)** that, the NexION ICP-MS provided '*an all-matrix solution'* resulting in '*simplified sample preparation and higher quality data;* (*Exhibit 3- page 7-8*);

**c)** that, the PERKINELMER method required only 40 seconds of analysis per sample and 100 seconds running a full suite of elements pr sample (*Exhibit 3- page 10*);

#

42) After the seminar presentations, both RHODEN and GREENBAUM continued to restate representations made in all three presentations as set forth in paragraph(s) 37 (a) and (b); ¶39 (a)-(f) and ¶41 (a)-(c) further continued to make the same representations as set forth in Paragraph 18 (a)-(k), as well as, the representations made at the OREGON CONFERENCE as set forth in paragraph(s) 32 and 33, hereinabove in order to solicit and induce DEITER to purchase the PE INSTRUMENTS for THINK20's Maryland and California cannabis testing laboratories.

43) On September 26, 2018, DEITER received and email from PERKINELMER of the announcement in the *Cannabis Science & Technology Magazine* that PERKINELMER had developed a combination method for Residual Solvents and Terpenes re-confirming the representations which were being made at the September 20, 2018 Seminar in Oakland, CA by KWOKA (Exhibit "3").

44) On October 1, 2018, DEITER requested a price sheet for the PE INSTRUMENTS cannabis package.

45) On October 10, 2018, RHODEN sent an email to DEITER with a two (2) page attachment stating the price and throughput for each of the PE INSTRUMENTS along with the Revenue Model discussed by RHODEN on August 16, 2018 at the Shelter Island meeting. A copy of the 10-1-2018 email and the attachment to the email is attached hereto as Exhibit "4" and incorporated herein by this reference.

46) RHODEN setup a meeting for November 7, 2018, in San Jose, California for the THINK20 Lab team consisting of, DEITER, Sergy Latyshev ("SERGY"), and Ben Osborn ("BEN") to meet with RHODEN and GREENBAUM at the PERKINELMER's office in San Jose, California.

**47)**  During the November 7, 2018 San Jose visit, RHODEN and GREENBAUM discussed PE INSTRUMENTS overview and capabilities in detail with the THINK20 LAB TEAM and made the representations to them which were initially discussed and represented to DEITER at the August 16, 2018 breakfast meeting as set forth in paragraph 18 (a)–(k) through 23; the OREGON CONFERENCE as set forth in paragraph(s) 32 & 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 (a) and (b); ¶39 (a)-(h) and ¶41 (a)-(c), inclusive.

**48)**  During the November 7, 2018 San Jose visit, GREENBAUM for the first time disclosed to the THINK20 Lab Team that, that PERKINELMER was replacing the Qsight 220 with the Qsight 420 (i.e., pesticides) which was pretty much the same as the current Qsight 220 but was more efficient with greater sensitivity to meet the stringent regulatory requirements of the BCC.

**49)**  GREENBAUM and RHODEN further represented that the Qsight 420 will be delivered with a fully developed Method and complete standardized SOP's for quick, easy, and efficient validation and the Qsight 420 will have the same throughput as the Qsight 220 of 60 sample/vials in 24-hour period.

**50)**  During November 7, 2018 San Jose meeting, RHODEN and GREENBAUM made additional claims and representations to DEITER, SERGY and BEN as follows;

   **a)**  that, the PE INSTRUMENTS once delivered, setup and installed, the validation process of the PE INSTRUMENTS will be simple, quick, and easy and will not take more than two (2) months primarily due to PERKINELMER'S fully developed methods and complete SOP'S;

   **b)**  that, all PE INSTRUMENTS including the new Qsight 420 will be able to integrate with INDIGO's Ascent software;

**c)** that, PERKINELMER was prompt and efficient in providing onsite instrument support by a service engineer within 24-48 hours of request for service on any PE INSTRUMENT issue.

**51)** Also, during the November 7, 2018 meeting, RHODEN and GREENBAUM provided DEITER and the THINK20 Lab team with a PERKINELMER handout summarizing the throughput and sample run time for each of the cannabis suite instruments (See Exhibit "4"). This handout was the same handout emailed on October 10, 2018 (See Exhibit "4"). Exhibit "4" is incorporated herein by this reference.

**52)** RHODEN reviewed the Two (2) page handout (Exhibit "4") with the THINK20 Lab team and specifically discussed with and made representations to, as follows:

**a)** the sample throughput per 24-hour period was represented for each of the instruments as follows; **(i)** ICP/MS (i.e., Heavy Metals) 288 Vials; **(ii)** HPLC (i.e., Potency) 131 vials; **(iii)** GC/MS (i.e., Residual Solvents/Terpenes)144 vials; and, **(iv)** newly introduced Qsight 420 (i.e., Pesticides and Mycotoxins) which had the same throughput of 60 vials as current model, Qsight 220, being replaced.

**b)** that, the run time per sample based on the PERKINELMER fully developed method and complete SOP's for each instrument was represented for each of the instruments as follows; **(i)** ICP/MS (i.e., Heavy Metals) 5 minutes; **(ii)** HPLC (i.e., Potency) 11 minutes; **(iii)** GC/MS (i.e., Residual Solvents/Terpenes) 10 minutes; and, **(iv)** Qsight 420 (i.e., Pesticides and Mycotoxins) 24 minutes. A copy of the referenced handout provided by RHODEN is attached hereto as Exhibit "4" and incorporated herein by this reference.

**53)**   Also, during the meeting on November 7, 2018, RHODEN reconfirmed and highlighted the salient points in discussing the PE INSTRUMENTS:

a) **FLEXAR-HPLC:** that, the SOP's were completed for 12 Cannabinoids for all matrices, (i.e., Flower, oil, and edibles) and once installed, the instrument will yield results that are reproducible and accurate for a quick and easy validation process which will take only two (2) to three (3) weeks and that the instrument will be integrated with INDIGO'S Assent software;

b) **QSIGHT 420:** that, the Qsight 420 was ready for delivery in early 2019 which was replacing the current Qsight 220; the Methods and SOP'S for the Qsight 420 were fully developed and had the same efficiency and throughput as the Qsight 220, as discussed earlier in Exhibit 4, but the Qsight 420 had greater sensitivity to meet the action limits for the stringent California BCC regulations, as well as, low matrix and ion suppression. Also, the QSight 420 will integrate with INDIGO'S Assent software. GREENBAUM further added by stressing the point that, PERKINELMER was the only vendor to have a universal method with complete developed Methods and SOP'S.

c) **CLARUS SQ8:** that, one instrument can run both terpene and residual solvents analysis and PERKINELMER had developed and combination Method and SOP which will allow the instrument to run analysis for both Terpenes and Residual Solvents in one application, as represented by KWOKA at the Oakland Seminar on September 20, 2018. The run time for the combination method for the 38 terpenes was eight (8) minutes per sample and, the Clarus SQ8 will also integrate with INDIGO'S Assent software.

**d) NEXION 2000-B:** that, the Methods are fully developed and SOP'S complete and finalized. RHODEN specifically addressed the issue of the regular NI cones for Nexion 2000-B which would last for a minimum of one-year eliminating the need to purchase expensive Platinum NI cones resulting in a considerable cost savings to THINK20. Also, the NexION 2000-B will be integrated with INDIGO'S Assent software.

54) Based on the representations made by RHODEN and GREENBAUM during the various meetings, conferences and seminars, the materials provided by PERKINELMER at the Oakland Seminar on September 20, 2018 and the November 7, 2018 meeting in San Jose, California, DEITER discussed with his partner's at THINK20 the representations made regarding the PE INSTRUMENTS at the August 16, 2018 breakfast meeting as set forth in paragraph 18 (a)–(k); the OREGON CONFERENCE as set forth in paragraph(s) 32 & 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 (a) and (b); ¶39 (a)-(h) and ¶41 (a)-(c), inclusive and the November 7, 2018 San Jose meeting as set forth in paragraph(s) 47 through ¶53, inclusive.

55) Based on the representations about the PE INSTRUMENTS as set forth above in Paragraph 54, on November 12, 2018, THINK20  notified GREENBAUM and RHODEN that THINK20 was moving forward with PE INSTRUMENTS for each of its two (2) labs, one in Maryland and the second in California but needed further clarification on the instruments and the Qsight 420before placing a purchase order.

56) On November 14, 2018, DEITER travelled to Las Vegas to attend MJ BIZCON conference and met with GREENBAUM, SCHMIDT, RHODEN to physically see the Qsight 420 which was introduced at MJ BIZCON conference.

57) During various times at the MJ BIZCON conference in Las Vegas, at PERKINELMER'S MJ BIZCON booth SCHMIDT and RHODEN met and SCHMIDT and RHODEN together presented to DEITER the new Qsight 420 which was being displayed and RHODEN continued to reconfirm and represent the same claims and representations previously made about the PE INSTRUMENTS by himself and GREENBAUM, as set forth in following paragraph(s) 18 (a)–(k); the OREGON CONFERENCE as set forth paragraph(s) 32 & 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 (a) and (b); ¶39 (a)-(h) and ¶41 (a)-(c), inclusive; the November 7, 2018 San Jose meeting as set forth in paragraph(s) 47 through ¶53, inclusive.

58) At the conference, SCHMIDT, and RHODEN continually represented to DEITER that the Method and SOP was fully developed in all matrices for the Qsight 420 and again reconfirmed that the developed method and SOP for the Qsight 420 yielded a throughput of sixty (60) sample vials in a 24-hour time period yielding a run time of 24 minutes per sample. Additionally, stressed that the Qsight 420 had greater sensitivity to meet the stringent BCC regulations for pesticides in California compared to the current Qsight 220.

59) Additionally, RHODEN and SCHMIDT provided DEITER with a copy of a press release for the Qsight 400 to DEITER which further affirmed his decision to move forward with the PE INSTRUMENTS. A copy of the 11-14-2018 MJBIZCON press release for the newly introduced Qsight 400 series model is attached hereto as Exhibit "5" and incorporated herein by this reference.

60) At MJBIZCON conference, DEITER advised RHODEN that THINK20 would not order the Qsight 220 but wait for the Qsight 400 to be released in early part of 2019.

**61)**  On November 21, 2018, RHODEN sent the quotes for the PE INSTRUMENTS along with the price list and Revenue projections as set forth in Exhibit "Exhibit 4" which was previously sent in an email on 10-1-2018. A copy of the 11-21-2018 Email with the 10-1-2018 Price List with ROI and the Quotes for each of the PE INSTRUMENT is attached hereto as Exhibit "6" and incorporated herein by this reference.

**62)**  The November 21, 2018, email of ROHDEN with the attachments (see Exhibit "6"), as set forth hereinabove in paragraph 62, was sent to DEITER and Edward Sawicki ("SAWICKI") the CEO of THINK20 and the person in charge of the Maryland Lab. The RHODEN email stated, *'the Quotes and summary of the PerkinElmer California Cannabis Solutions for your labs. **PerkinElmer also includes full California Cannabis SOP's for each Solution".***

**63)**  Thereafter, on December 13, 2018, RHODEN sent specifications and power, gas, vents, and spacing requirements for THINK20 to prepare the laboratory in Maryland and Irvine, California for installation of the PE INSTRUMENTS upon their delivery.

**64)**  On February 11, 2019, THINK20 purchased the PE INSTRUMENTS for its Maryland Lab in the amount of, one million seventy-five thousand eight hundred and ninety-seven Dollars and forty-four cents ($1,075,897.44), The purchase was financed through Quantum Analytics.

**65)**  On March 25, 2019, the PE INSTRUMENTS arrived at the Maryland Lab.

**66)**  On April 3, 2019, THINK20 purchased a second set of PE INSTRUMENTS for its California Lab in the amount of, nine hundred and eighty-three thousand seven hundred and one Dollars ($983,701.00). The purchase was financed through Sweet Leaf Capital.

**67)** On May 31, 2019, the PE INSTRUMENTS were delivered to the Irvine, California laboratory.

## SPECIFIC ISSUES WITH CANNABIS TESTING PE INSTRUMENTS

**68)** **FLEXAR-HPLC (Potency Analyzer)**. At the Maryland Laboratory, during the validation process, using PERKINELMER'S developed Method and Standardized SOP'S the following issues were encountered IN THE validation causing a substantial delay and loss of clients and resulting in the eventual closure of the Maryland Laboratory as the Flexar-HPLC could not be validated. A summary of some of the pertinent issues plaguing the Flexar-HPLC are as follows:

**(a)** that, the standardized SOP's, and validated Methods could not produce reliable, accurate and precise and repeatable results to validate the instrument;

**(b)** that, the Method provided by PERKINELMER was only for flower and no method or SOP's was provided for any of the other matrices.

**(c)** that, the instrument was unable to get recoveries for cannabinoids;

**(d)** that, the instrument was unable quantify and qualify cannabinoids correctly;

**(e)** that, the test run results indicated that the Method provided by PERKINELMER could not resolve CBD from CBDA and CBG;

**(f)** that, the method provided for by PERKINELMER could not assay in the 6 minutes stated in the SOP's, less than what was originally represented (i.e., Exhibit 4) but instead was taking between 20 to 30 minutes for each sample vial to be assayed;

\#

**(g)** that, the installed Flexar-HPLC required a longer equilibration time between runs in order to provide reproducible chromatography than represented in the SOP'S.

**(h)** that, during the validation process and test runs, tested >11 different conditions to increase the resolution between 11 cannabinoid compounds which included tweaking chromatography gradients, flow rates and buffer components. Despite the changes to the Method and SOP'S, the test runs could not complete a baseline separation of all 11 of compounds as required by the BCC regulations for validating the Flexar-HPLC;

**(i)** that, the FLEXAR-HPLC instrument was not able to get the necessary and required recoveries for the Cannabinoids (i.e., 50-70%) with the extraction procedure described in the fully developed SOP provided by PERKINELMER;

**(j)** that, the test runs resulted in inconsistent peaks (i.e., different peaks when samples were run, sometime 11 and sometimes 12 and the two peaks would get closer and merge into one) as a consequence, the Flexar-HPLC was not able to produce reliable and repeatable results.

**(k)** that, the instrument was not able to integrate with INDGO'S Assent software;

**(l)** that, PERKINELMER'S application scientists support was severely lacking, as the Application Scientists and Field Engineers were unable to resolve any the issues plaguing the Flexar-HLPC at the Maryland facility. PERKINELMER application Scientists, after four (4) months of troubleshooting, with their own SOP & Method were unable to produce reliable and repeatable data and the Flexar-HPLC was de-commissioned;

**69)** **QSIGHT 420 (Pesticide Mycotoxins).** During the validation process, the following issues were encountered in using the developed Method and

Standardized SOP'S thus, causing a delay in the validation process of over six (6) months, a summary of some of the pertinent issues encountered by THINK20 is as follows;

**(a)** that, the SOP & Method provided by PERKINELMER was not optimized for all matrices and/or sample conditions;

**(b)** that, the Application Scientists and Field Personnel were extremely slow to respond to the queries regarding the issues which were encountered during the validation process as stated herein, generally responding in four (4) to Six (6) days after assistance was requested;

**(c)** that, PERKINELMER SOP was incomplete as to the preparation of Nalid and Captain standards to ensure that the results would meet BCC Regulations for linearity and recovery.

**(d)** that, the PERKINELMER Method and SOP failed to detect the J-spinetoram, as a result, the entire BCC pesticide/mycotoxin validation had to be redone in its entirety.

**(e)** that, the instrument, and analysis could not run at the same time, the software was slow and when running both simultaneously the software crashed resulting in a loss of data for the sample run, as well as, the Chromatograms disappeared when analyzing the results;

**(f)** that, there was a low signal to noise for alpha and gamma cloidane;

**(g)** that, the SOP provided for certain matrices, (i.e., gummies) did not dissolve in acctronite;

**(h)** that, the 10x dilution factor for concentrates as provided in the SOP did not work due to ion suppression;

**(i)** that, the PERKINELMER'S Application Scientists and Field Personnel changed the original factory SOP's and Methods several times but were unable to produce reliable, accurate results with precision and

repeatability for purposes of validation in compliance with BCC Regulations;

**(j)** that, the changes to the SOP's made by PERKINELMER'S Application Scientists and Field Personnel resulted in an increase of the internal standard list which had originally started with ten (10) and increased to forty (40) resulting in an increase in operational cost of approximately, forty thousand Dollars ($40,000.00);

**(k)** that, the Application Scientists and Field Personnel when responding to the issues identified hereinabove were not always up to speed and knowledgeable on the Methods, SOP'S and the Instrument Software and at times were unable to provide any meaningful assistance;

**(l)** that, the fully developed Methods, and standardized SOP's provided by PERKINELMER for the Qsight 420 could not be validated for over six (6) months with the assistance of PERKINELMER'S Application Scientists;

**70)** **CLARUS SQ8 & GC/MS. (Residual Solvents and Terpenes).** During the validation process, the following issues were encountered by THINK20 using PERKINELMER developed Method and Standardized SOP'S causing a delay in the validation process, a summary of some of the pertinent issues are as follows;

**(a)** that, the PERKINELMER SOP and Method provided for Residual Solvents did not work, as the Calibration curves per the SOP encountered issues due to high variance of sensitivity;

**(b)** that, the PERKINELMER SOP and standard Terpene Method never worked, the PERKINELMER SOP and method had recovery issues when running samples in actual matrix and often unable to recover analytes at the end of a run;

**(c)** that, the combination method to run both the Residual Solvents and the Terpenes was never provided to THINK20 despite numerous requests;

**(d)** that, the GC/MS and headspace had frequent communication issues which resulted in having to rerun samples;

**(e)** that, the software for the instrument was antiquated and was able to only run on one single core resulting in software crashes and as a consequence the reporting generator often produced a blank report and computer required a reboot every day to help mitigate the issue.

**(f)** that, the Software was inconsistently registering qualifier ions which resulted in no concentration values.

**(g)** that, the instrument was using a tank of helium every four (4) days when normally each tank should last a minimum of four (4) to Six (6) weeks which resulted in the usage of filaments at a pace of approximately, one (1) per month, under normal circumstances a filament should a minimum of six (6) months.

**71)** **NEXION ICP-MS (Heavy Metals).** During the validation process, THINK20 encountered issues in the validation process causing considerable delays as a result of using PERKINELMER'S developed Method and Standardized SOP'S. A summary of some of the pertinent issues encountered by THINK20 is as follows;

**(a)** that, the ICP Method provided by PERKINELMER created mercury contamination issues which manifested after a period of time based on the sample run. The PERKINELMER Field Engineers advised THINK20 to frequently clean the tubing which resulted in a short test run without contamination before requiring a cleaning.

**(b)** that, the contamination of Mercury caused daily calibrations to fail, during test runs resulting in the ccv and controls to fail due to the carry over.

**(c)** that, it took PERKINELMER engineering and application support personnel several months to resolve and develop a new SOP & Method to reduce mercury by 4x due to the issues identified in (a) & (b) hereinabove,

**(d)** that, the NI cones would only last a month and had to be replaced with Platinum Cones at a substantial cost.

## FIRST CAUSE OF ACTION
## FRAUD & DECEIT-INTENTIONAL MISREPRESENTATION
### (Cal. Civ. Code §1710(1))
### (Against all Defendants)

**72)** Plaintiff THINK20 hereby re-alleges, refers, and incorporates by this reference, paragraphs 1 through 71 of this Complaint as though fully set forth herein.

**73)** From August 16, 2018 and thereafter until November 21, 2018 PERKINELMER through its employees RHODEN, GREENBAUM, SCHMIDT and others, made specific written and verbal claims and representations about the PERKINELMER'S instrument solutions for Cannabis Testing in California (i.e., PE INSTRUMENTS) to DEITER and other representatives of Plaintiff THINK20. RHODEN, GREENBAUM, SCHMIDT and others, were acting within the course and scope of their employment and authority on behalf of Defendant PERKINELMER.

**74)** PERKINELMER through its employees, RHODEN, GREENBAUM, SCHMIDT and other PERKINELMER personnel, made the representations to DEITER of THINK20 as set forth in the following paragraph(s) 18 through ¶23; the OREGON CONFERENCE as set forth in paragraph(s) 32

& 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 through ¶41, inclusive; the November 7, 2018 San Jose meeting as set forth in paragraph(s) 47 through ¶53, inclusive, and at the MJ BIZCON conference in Las Vegas on November 14, 2018 as set forth in paragraph(s) 57,through 62, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference.

75) Plaintiff THINK20 is informed and believes and thereupon alleges that, at the time of making the representations, as set forth in the following paragraph(s) 18 through ¶23; the OREGON CONFERENCE as set forth in paragraph(s) 32 & 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 through ¶41, inclusive; the November 7, 2018 San Jose meeting as set forth in paragraph(s) 47 through ¶53, inclusive, and at the MJ BIZCON conference in Las Vegas on November 14, 2018 as set forth in paragraph(s) 57,through 62, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference. PERKINELMER through its employees RHODEN, GREENBAUM, SCHMIDT and Others in making the above-referenced representations, knew them to be false and made these representations with the intent to deceive and defraud DEITER who was acting on behalf of THINK20 with the expectation that DEITER would rely on these afore-mentioned representations and would be induced to purchase the PE INSTRUMENTS for THINK20's two (2) Laboratories in Maryland and California over competitor Agilent Technologies cannabis testing instruments.

76) Plaintiff THINK20 is informed and believes and thereupon alleges that, the claims and representations made about the PE INSTRUMENTS, as alleged

hereinabove, by PERKINELMER authorized employees, GREENBAUM, RHODEN, SCHMIDT, and Others from August 16, 2018 and thereafter until November 21, 2018, were in fact false. The true facts were that,

**a)** that, the PE INSTRUMENTS, each of them, were not instruments which were plug and play nor were they a turn-key solution for cannabis testing operations which was easy to operate nor did the PE INSTRUMENTS reduce or keep costs of operation of the instruments low, furthermore, the operation of the PE INSTRUMENTS was not simple and Scientists with extensive experience with analytical instrumentation were not able to operate and run validation tests on the PE INSTRUMENTS with PERKINELMER'S developed Methods and SOP'S;

**b)** PE INSTRUMENTS; (a) Qsight 420 (Pesticides); (b) Flexar-HPLC (Potency); (c) Nexion ICP/MS (Heavy Metals) and (d) Clarus SQ8 GC/MS (Residual Solvents) did not have validated Methods with fully developed SOP'S in the multiple cannabis matrices, and the PE INSTRUMENTS could not produce test results with any repeatability, accuracy, or precision to meet the stringent requirements and regulations for preparing a BCC Validation package for regulatory approval;

**c)** that, PERKINELMER did not have complete & supported SOP's & Methods for cannabis on all instrumentation and PERKINELMER did not have the experienced scientific & technical support staff to support the PE INSTRUMENTS or the service personnel to provide field support within 24 to 48 hours;

**d)** that, the developed Methods, and standardized SOP'S provided by PERKINELMER for each of the Cannabis Testing PE INSTRUMENTS did not provide a simple, quick, efficient, and easy solution for preparing

a BCC Validation package for regulatory approval nor did it save time and money;

**e)** that, the validation of the PE INSTRUMENTS took well over two (2) months and no cannabis laboratory in California had validated the PE INSTRUMENTS in compliance with BCC regulations in two (2) months;

**f)** that, other California cannabis laboratories which had purchased PE INSTRUMENTS could not validate any of the PE INSTRUMENTS quickly for submission to the BCC and were not able to quickly get BCC approval to generate revenue;

**g)** that, the PERKINELMER developed Methods and SOP's were not fully developed and the methods could not be easily copied and replicated to create a *Global Method* across all PE INSTRUMENTS;

**h)** that, the throughput for each of the PE INSTRUMENTS was overstated and inaccurate and was not verified in the laboratory setting using real flower, edibles, and oils;

**i)** that, the sample/vial run time for each of the PE INSTRUMENTS was understated and inaccurate and was not verified in the laboratory setting using real flower, edibles, and oils;

**j)** that, the revenue model presented was inaccurate and not proven in a real laboratory setting with BCC validated PE INSTRUMENTS using actual flower, edibles, and oils for testing;

**k)** that, each of the PE INSTRUMENTS were not Beta tested and validated in all matrices with PERKINELMER developed Methods and SOP'S.

**l)** that, the PE INSTRUMENTS were not integrated nor were they capable of being integrated with INDIGO's Assent Software.

#

**77)**     Plaintiff THINK20 is informed and believes and thereupon alleges that, the claims and representations specifically made about the FLEXAR-HPLC as alleged hereinabove, by PERKINELMER authorized employees, GREENBAUM, RHODEN, SCHMIDT and Others from November 7, 2018 and thereafter were in fact false. The true facts were that,

**(a)** that, the standardized SOP'S, and validated Methods could not successful provide reliable, accurate and precise results to validate the instrument in compliance of BCC regulations;

**(b)** that, the Method provided by PERKINELMER was only for flower and no method or SOP's was provided for any of the other matrices;

**(c)** that, the instrument was unable to get recoveries for cannabinoids;

**(d)** that, the instrument was unable quantify and qualify cannabinoids correctly;

**(e)** that, the Method provided by PERKINELMER could not resolve CBD from CBDA and CBG;

**(f)** that, the method provided by PERKINELMER could not assay in the 6 minutes stated in the SOP's but was taking between 20 to 30 minutes for each sample vial to be assayed;

**(g)** that, the Flexar-HPLC required a longer equilibration time between runs in order to provide reproducible chromatography than represented in the SOP'S;

**(h)** that, the PERKINELMER Method and SOP'S, could not complete a baseline separation of all 11 of compounds as required by the BCC regulations for validating the Flexar-HPLC;

**(i)** that, the PERKINELMER provided Method was unable to get the necessary and required recoveries for the Cannabinoids (i.e., 50-70%) with the extraction procedure described in the fully developed SOP;

**(j)** that, the PERKINELMER provided Method and SOP'S had a history of inconsistent peaks thus, the test runs were not able to produce reliable, accurate and precise results with any repeatability for purposes of validation for the BCC;

**(k)** that, the instrument was not able to integrate with INDGO'S Assent software;

**(l)** that, the Flexar-HPLC was not Beta tested and validated using the PERKINELMER Method and SOP's in all matrices;

**(m)** that, no California cannabis testing lab was successful in validating the Flexar-HPLC using the PERKINELMER developed methods and SOP's in compliance with BCC regulations.

**78)** Plaintiff THINK20 is informed and believes and thereupon alleges that, the claims and representations specifically made about the Qsight 420 as alleged hereinabove, by PERKINELMER authorized employees, GREENBAUM, RHODEN, SCHMIDT and Others from November 7, 2018 and thereafter were in fact false. The true facts were that,

**a)** that, the SOP & Method provided by PERKINELMER was not optimized for all matrices and/or sample conditions;

**b)** that, PERKINELMER SOP for preparation of Nalid and Captain standards to ensure that the results would meet BCC Regulations for linearity and recovery was incomplete;

**c)** that, the PERKINELMER provided Method and SOP had a history of failing to detect the J-spinetoram;

**d)** that, the PERKINELMER provided Method and SOP had a history of not being able to meet all action limits (LOQ) required by the BCC for pesticides and mycotoxins;

**e)** that, the instrument, and analysis could not run at the same time, the software was slow and when running both simultaneously the software crashed resulting in a loss of data for the sample run, as well as, the Chromatograms disappeared when analyzing the results;

**f)** that, the instrument had a history of a low signal to noise for alpha and gamma cloidane;

**g)** that, the PERKINELMER provided Method and SOP for certain matrices, (i.e., gummies) did not dissolve in acctronile;

**h)** that, the PERKINELMER SOP called for a 10x dilution factor for concentrates and could not produce reliable data for test runs due to ion suppression;

**i)** that, the Qsight 420 was not Beta tested and validated using the PERKINELMER Method and SOP's in all matrices;

**j)** that, the instrument was not able to integrate with INDGO'S Assent software;

**79)** Plaintiff THINK20 is informed and believes and thereupon alleges that, the claims and representations specifically made about the CLARUS SQ8 as alleged hereinabove, by PERKINELMER authorized employees, GREENBAUM, RHODEN, SCHMIDT and Others from August 16, 2018 and thereafter were in fact false. The true facts were that,

**a)** that, PERKINELMER had not fully developed a Combination Method for the CLARUS SQ8 allowing both Residual Solvents and Terpenes applications to be analyzed on a single configuration;

#

**b)** that, the CLARUS SQ8's was not Beta tested and validated using the PERKINELMER Combination Method for the CLARUS SQ8 allowing both Residual Solvents and Terpenes applications to be analyzed on a single configuration in all matrices;

**c)** that, the CLARUS SQ8 did not have a predetermined turnkey method which could successfully validate the instrument in compliance with BCC regulations;

**d)** that, the CLARUS SQ8, samples could not be immediately run, after installation, to provide results which were precise, accurate and repeatable;

**e)** that, the CLARUS SQ8 was not capable of measuring both Terpenes and Residual Solvents in one run with 7.5 minutes and 8.1 minutes for separating 38 Terpenes;

**f)** that, the CLARUS SQ8 sample prep for oils, flower and edibles did not produce accurate and precise results;

**80)** Plaintiff THINK20 is informed and believes and thereupon alleges that, the claims and representations specifically made about the NEXION ICP/MS as alleged hereinabove, by PERKINELMER authorized employees, GREENBAUM, RHODEN, SCHMIDT and Others from August 16, 2018 and thereafter were in fact false. The true facts were that,

**(a)** that, the ICP Method provided by PERKINELMER had a history of mercury contamination issues which manifested after a period of time based on the sample run. As a result, the contamination of Mercury resulted in failure of daily calibrations.

**(b)** that, the NI cones had to be replaced on monthly basis;

**(c)** that, the NEXION ICP/MS was not Beta tested and validated using the PERKINELMER Method and SOP's in all matrices;

81)  At the time that the representations regarding the PE INSTRUMENTS and each of them, were being made to THINK20, PERKINELMER its employees, RHODEN, GREENBAUM, SCHMIDT and Other employees had specific knowledge from other California labs, which had purchased PE INSTRUMENTS, that the Methods and SOP's provided by PERKINELMER with its PE INSTRUMENTS could not validate each of the PE INSTRUMENTS in all matrices compliance with BCC regulations for regulatory approval for licensure for all the reasons cited hereinabove in paragraphs 74, through 80, inclusive, each of which are incorporated herein by this reference.

82)  At the time that the representations regarding the PE INSTRUMENTS and each of them, were being made to THINK20, PERKINELMER its employees, RHODEN, GREENBAUM, SCHMIDT and Other employees had specific knowledge that PERKINELMER was continuing to develop methods and SOPS for each of the PE INSTRUMENTS to meet the regulatory requirements of the BCC and the developed Methods and SOPS for the PE INSTRUMENTS were not being Beta Tested prior to releasing them with the sold PE INSTRUMENTS.

83)  At the time that the representations regarding the PE INSTRUMENTS and each of them, were being made to THINK20, PERKINELMER its employees, RHODEN, GREENBAUM, SCHMIDT and Other employees had specific knowledge that the validation process for the PE INSTRUMENTS, each of them, was not a plug and play turnkey solution for cannabis testing in California;

84)  Plaintiff THINK20 is informed and believes and thereupon alleges that, when PERKINELMER through its employees, RHODEN, GREENBAUM, SCHMIDT and other PERKINELMER personnel, each of them, made the

representations to DEITER of THINK20 as set forth the following paragraph(s) 18 through ¶23; the OREGON CONFERENCE as set forth in paragraph(s) 32 & 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 through ¶41, inclusive; the November 7, 2018 San Jose meeting as set forth in paragraph(s) 47 through ¶53, inclusive, and at the MJ BIZCON conference in Las Vegas on November 14, 2018 as set forth in paragraph(s) 57,through 62, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference, knew them to be false and made these representations with the intention to deceive and defraud DEITER and THINK20 and to induce DEITER and THINK20 to act in reliance on these representations and purchase the PE INSTRUMENTS over its competitors cannabis testing instruments.

85) Plaintiff THINK20 is informed and believes and thereupon alleges that, at the time these afore-mentioned representations were made by PERKINELMER employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, and at the time THINK20 took the actions herein alleged, THINK20was ignorant of the falsity of the PERKINELMER'S representations and believed them to be true.

86) In reliance on these representations, THINK20 was induced to and did purchase PE INSTRUMENTS for its two (2) labs in Maryland and California at a total cost of, $2,059,598.44. Had Plaintiff THINK20 known the actual facts, THINK20 would not have taken such action.

87) Plaintiff THINK20's reliance on the representations of PERKINELMER employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER was justified because PERKINELMER is a 14-billion-dollar Fortune 500 publicly traded company successful in the medical and

food testing industry and appeared to be highly knowledgeable about the PE INSTRUMENTS and the SOP'S and Methods developed for the Cannabis Testing Instruments.

88)  As a direct, proximate, and foreseeable result of fraud, deceit, and conspiracy to defraud by the PERKINELMER through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, Plaintiff THINK20 has suffered actual out of pocket damages and substantial financial and economic losses all in an amount at a minimum of not less than three million Dollars ($3,000,000.00), the exact amount to be determined at trial according to proof.

89)  In doing the acts herein alleged, PERKINELMER through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, PERKINELMER acted with malice, fraud and oppression, as defined under California Civ. Code § 3294(c), willfully and with the intent to cause injury to THINK20. PERKINELMER is therefore guilty of malice and/or oppression and/or fraud in conscious disregard of THINK20'S rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish PERKINELMER and deter others from engaging in similar misconduct.

WHEREFORE, Counterclaimant Prays for Judgment as set forth in the Prayer.

## SECOND CAUSE OF ACTION
## FRAUD & DECEIT-NEGLIGENT MISREPRESENTATION
### (CA Civil Code §1710(2))
### (Against Defendant PERKINELMER)

90)  Plaintiff THINK20 hereby re-alleges, refers, and incorporates by this reference, paragraphs 1 through 89 of this Complaint as though fully set forth herein.

**91)** Plaintiff THINK20 is informed and believes and thereupon alleges that, in the course of PERKINELMER'S business, PERKINELMER'S Senior Management team authorized GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, to disseminate and provide false information and misstatements of material facts about the PE INSTRUMENTS, as set forth in the following paragraph(s) 18 through ¶23; the OREGON CONFERENCE as set forth in paragraph(s) 32 & 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 through ¶41, inclusive; the November 7, 2018 San Jose meeting as set forth in paragraph(s) 47 through ¶53, inclusive, and at the MJ BIZCON conference in Las Vegas on November 14, 2018 as set forth in paragraph(s) 57, through 62, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference.

**92)** Plaintiff THINK20 is informed and believes and thereupon alleges that, at the time that PERKINELMER'S Senior Management team authorized GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, disseminated and provided false information and made misrepresentations of material facts as alleged in Paragraph 91 hereinabove, PERKINELMER, employees, GREENBAUM, RHODEN, SCHMIDT, and Others failed to exercise reasonable care or competence in obtaining or communicating this information and failed to exercise reasonable care as to the veracity and accuracy of its statements as alleged hereinabove in paragraph 91.

**93)** Plaintiff THINK20 is informed and believes and thereupon alleges that, PERKINELMER, through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, made misrepresentations of material facts as alleged in Paragraph 91, hereinabove,

they had no reasonable ground for believing them to be true in that PERKINELMER had information available to it as alleged in paragraph(s) 76 through 81, inclusive, each of which are incorporated herein by this reference in their entirety.

94) Plaintiff THINK20 is informed and believes and thereupon alleges that, PERKINELMER through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER made the representations with the intention of inducing THINK20 to act in reliance of the representation of the statements as alleged hereinabove and be dissuaded from purchasing competitor Agilent Technologies' cannabis testing instruments and instead purchase PERKINELMER'S Cannabis Testing PE INSTRUMENTS.

95) Plaintiff THINK20 relied on the false information and misstatements of material facts as alleged in paragraph 91 hereinabove in deciding to purchase PERKINELMER'S Cannabis Testing Instruments over AGILENT'S cannabis testing instruments.

96) Plaintiff THINK20 relied on representations of PERKINELMER, through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, as outlined hereinabove in paragraph 91, because PERKINELMER manufactured the Cannabis Testing Instruments, was a 14-billion-dollar Fortune 500 company which was publicly traded and was successful in the medical instruments space and appeared to be highly knowledgeable about the SOP'S and Methods developed for the Cannabis Testing Instruments.

97) Plaintiff THINK20'S reliance on representations of PERKINELMER, through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, was reasonable and justifiable.

**98)**   In reasonable and justifiable reliance on representations of PERKINELMER, through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, statements Plaintiff THINK20 on November 12, 2018 decided to purchase PE INSTRUMENTS for its Maryland and Irvine laboratory at a total cost of, $2,059,598.44. But for the material facts as alleged in paragraph 91, hereinabove, Plaintiff THINK20 would not have purchased PE INSTRUMENTS.

**99)**   As a direct, proximate, and foreseeable result of the negligent misrepresentations by PERKINELMER through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, Plaintiff THINK20 has suffered actual out of pocket damages and substantial financial and economic losses all in an amount at a minimum of not less than three million Dollars ($3,000,000.00) the exact amount to be determined at trial according to proof.

**100)**   In doing the acts herein alleged, PERKINELMER through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, PERKINELMER acted with malice, fraud and oppression, as defined under California Civ. Code § 3294(c), willfully and with the intent to cause injury to THINK20. PERKINELMER is therefore guilty of malice and/or oppression and/or fraud in conscious disregard of THINK20'S rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish PERKINELMER and deter others from engaging in similar misconduct.

WHEREFORE, Counterclaimant Prays for Judgment as set forth in the Prayer.

#

#

#

### THIRD CAUSE OF ACTION
### FRAUD & DECEIT-SUPPRESSION OF FACTS
### (CA Civil Code §1710(3))
### (Against Defendant PERKINELMER)

101) Plaintiff THINK20 hereby re-alleges, refers, and incorporates by this reference, paragraphs 1 through 100 of this Complaint as though fully set forth herein.

102) Plaintiff THINK20 is informed and believes and thereupon alleges that, in the course of PERKINELMER'S business, PERKINELMER, its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, concealed, suppressed, and failed to disclose material facts known to them. Specifically,

(a) that the method and SOP'S for the PE INSTRUMENTS, each of them, were not fully developed and did not meet the stringent criteria of California's stringent BCC guidelines;

(b) that, other Labs in California which had purchased some or all of the four PE INSTRUMENTS could not validate their PE INSTRUMENTS using the PERKINELMER developed methods in the standardized SOP'S in compliance of BCC regulations;

(c) that, the validated and reproducible methods, and standardized SOP's were not Beta tested in flower, oil, or edible matrices;

(d) that, the Method development and SOP's for some of the PE INSRUMENTS, were not developed by PERKINELMER but a third-party laboratory and the current Methods & SOP'S being provided to THINK20 by PERKINELMER for the PE INSTRUMENTS did not meet BCC requirements for validation purposes;

103) Plaintiff THINK20 is informed and believes and thereupon alleges that, in the course of PERKINELMER'S business, PERKINELMER, its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of

PERKINELMER, had pertinent facts known to them as set forth herein in Paragraphs 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference.

104) Plaintiff THINK20 is informed and believes and thereupon alleges that, PERKINELMER, its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, concealed, suppressed, and failed to disclose material facts known to them, as set forth in entirety in as set forth in Paragraphs 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference, and which PERKINELMER was bound to disclose and did not disclose in connection with claims and representations made to THINK20 as alleged hereinabove in paragraph 91 in attempting to induce THINK20 to purchase PE INSTRUMENTS.

105) PERKINELMER, its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, had an obligation to disclose to THINK20 the facts as alleged in paragraphs 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference.

106) The vital factual omission(s) as set forth hereinabove in paragraphs 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference, was material information that was vital and important in THINK20'S crucial decision-making process of whether or not to purchase PE INSTRUMENTS. But for the suppression of facts and omissions of RHODEN, as set forth in paragraphs 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference, THINK20 would not have purchased the PE INSTRUMENTS for

its Maryland and California cannabis testing laboratories at a total cost of, $2,059,598.44.

**107)** Had THINK20 been aware of the true material facts, set forth in as set forth in paragraph 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference, THINK20 would not have purchased PE INSTRUMENTS at a total cost of, $2,059,598.44.

**108)** PERKINELMER had a duty to disclose the material facts known to them which they suppressed as set forth in paragraphs 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference, because:

**a)** PERKINELMER had exclusive and /or far superior knowledge and facts related to the SOP issues plaguing PE INSTRUMENTS and these facts were: (1) not known to THINK20; (2) not reasonably discoverable through ordinary due diligence; (3) within fair and reasonable reach of PERKINELMER; and/or,

**b)** PERKINELMER made incomplete representations related to the performance of its PE INSTRUMENTS while purposefully concealing, suppressing, and withholding vital information and material facts from THINK20 which contradict the representations made in paragraphs, 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference;

**109)** The concealment, suppression, and withholding of vital material facts were basic to, or went to the essence of, the purchase of PE INSTRUMENTS at a total cost of, $2,059,598.44.

**110)** PERKINELMER acted with the intent to mislead and deceive THINK20 with sole objective of inducing THINK20 to purchase PE INSTRUMENTS at a total cost of, $2,059,598.44.

**111)** As a result of THINK20'S reasonable and justifiable reliance on PERKINELMER'S claims and representations made regarding the PE INSTRUMENTS and without knowledge of PERKINELMER'S material factual omissions and suppression of vital material facts, THINK20 on November 12, 2018 decided to purchase PE INSTRUMENTS. But for the material omissions and suppression of vital material facts, THINK20 would not have purchased PE INSTRUMENTS.

**112)** As a proximate result of suppression of facts which PERKINELMER was bound to disclose to THINK20, as herein alleged, paragraph(s) 76 through 81, each referenced paragraph is incorporated herein in their entirety by this reference, THINK20 purchased the PE INSTRUMENTS at a total cost of, $2,059,598.44.

**113)** As a direct, proximate, and foreseeable result of suppression of pertinent facts it was bound and obligated to disclose, PERKINELMER its employees, GREENBAUM, RHODEN, SCHMIDT, and others Plaintiff THINK20 has suffered actual out of pocket damages and substantial financial and economic losses all in an amount at a minimum of not less than three million Dollars ($3,000,000.00) the exact amount to be determined at trial according to proof.

**114)** In doing the acts herein alleged, PERKINELMER its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, PERKINELMER acted with malice, fraud and oppression, as defined under California Civ. Code § 3294(c), willfully and with the intent to cause injury to THINK20. PERKINELMER is therefore guilty of malice and/or oppression and/or fraud in conscious disregard of THINK20'S rights, thereby warranting an assessment of punitive damages

in an amount appropriate to punish PERKINELMER and deter others from engaging in similar misconduct.

WHEREFORE, Counterclaimant Prays for Judgment as set forth in the Prayer.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Defendant PERKINELMER)

115) Plaintiff-Complaint Defendant THINK20 hereby re-alleges, refers, and incorporates by this reference, paragraphs 1 through 114 of this Complaint as though fully set forth herein.

116) As the developer, manufacturer, marketer, distributor and/or or seller of each of the PE INSTRUMENTS, PERKINELMER provided an implied warranty of merchantability for each of the PE INSTRUMENTS.

117) Each of the PE INSTRUMENTS sold to THINK20 with its validated Method and fully developed and standardized SOP'S were defective, operationally flawed, and incapable of validating each of the PE INSTRUMENTS in compliance of stringent BCC regulations for obtaining a cannabis testing laboratory license.

118) Plaintiff THINK20 therefore, did not receive the Cannabis Testing PE INSTRUMENTS as impliedly warranted to be merchantable.

119) By virtue of the failure of the PE INSTRUMENTS to be validated on the fully developed SOP'S in compliance of BCC regulations, PERKINELMER developed, manufactured, and sold, PERKINELMER has breached the implied warranty of merchantability.

120) As a proximate result of suppression of facts which PERKINELMER was bound to disclose to THINK20, as herein alleged, paragraph(s) 76 through 81, inclusive, each referenced paragraph is incorporated herein in their

entirety by this reference, THINK20 purchased the PE INSTRUMENTS at a total cost of, $2,059,598.44.

121) As a direct, proximate, and foreseeable result of PERKINELMER'S afore-mentioned breach of the implied warranty of merchantability, Plaintiff THINK20 has suffered actual out of pocket damages for purchasing the PE INSTRUMENTS at a total cost of, $2,059,598.44 and substantial financial and economic losses all in an amount at a minimum of not less than three million Dollars ($3,000,000.00) the exact amount to be determined at trial according to proof.

WHEREFORE, THINK20 Prays for Judgment as set forth in the Prayer.

### FIFTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF FITNESS
### FOR A PARTICULAR PURPOSE
### (Against Defendant PERKINELMER)

122) Plaintiff THINK20 hereby re-alleges, refers, and incorporates by this reference, paragraphs 1 through 121 of this Complaint as though fully set forth herein.

123) In connection with the sale of the PERKINELMER'S Cannabis Testing Laboratory Instruments, (i.e., PE INSTRUMENTS) PERKINELMER through its employees, GREENBAUM, RHODEN, SCHMIDT, and others on behalf of PERKINELMER, made various promises, affirmations, and representations related to the functionality of the PE INSTRUMENTS as set forth in paragraph(s) 18 through ¶23; the OREGON CONFERENCE as set forth in paragraph(s) 32 & 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 through ¶41, inclusive; the November 7, 2018 San Jose meeting as set forth in paragraph(s) 47 through ¶53, inclusive, and at the MJ BIZCON conference

in Las Vegas on November 14, 2018 as set forth in paragraph(s) 57, through 62, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference.

124)  PERKINELMER gave express warranties that the PE INSTRUMENTS sold to THINK20 would conform to such promises, affirmations, and representations as given by PERKINELMER as set forth in paragraph 121, hereinabove.

125)  The promises, affirmations, and representations as set forth in set forth in paragraph 121, hereinabove, given by PERKINELMER as to the PE INSTRUMENTS became part of the basis of the bargain between THINK20 and PERKINELMER.

126)  In purchasing the PE INSTRUMENTS at a cost of at a total cost of, $2,059,598.44, THINK20 reasonably relied upon the various attributes thereof as expressly warranted by PERKINELMER, as set forth in set forth in paragraph 118, hereinabove.

127)  When THINK20 received PE INSTRUMENTS with the PERKINELMER developed Methods and standardized complete SOP's which were unable to validate any of the PE INSTRUMENTS in compliance with BCC regulations, for the reasons alleged hereinabove in paragraph, 76 through 81, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference.

128)  Immediately following the installation of each respective PE INSTRUMENT, each respective instrument could not quickly and easily be validated in compliance of BCC regulations using the standardized SOP's and developed Methods provided by PERKINELMER within 2 months of the installation.

**129)** PERKINELMER failed to remedy and provide developed Method and standardized complete SOP'S  for each of the PE INSTRUMENTS and failed to render them functional as represented and warranted in as set forth in paragraph(s) 18 through ¶23; the OREGON CONFERENCE as set forth in paragraph(s) 32 & 33 and at the September 20, 2018 Oakland Seminar as set forth in paragraph(s) as set forth in paragraph(s) 37 through ¶41, inclusive; the November 7, 2018 San Jose meeting as set forth in paragraph(s) 47 through ¶53, inclusive, and at the MJ BIZCON conference in Las Vegas on November 14, 2018 as set forth in paragraph(s) 57, through 62, inclusive, each referenced paragraph is incorporated herein in their entirety by this reference.

**130)** PERKINELMER has accordingly breached the express warranties it provided for the PE INSTRUMENTS, as set forth hereinabove in paragraph 121 and incorporated herein by this reference, which failed to perform and function as represented and warranted.

**131)** THINK20 was damaged as a direct and proximate result of PERKINELMER'S breach because (a) THINK20 would not have purchased the PE INSTRUMENTS had it known the true facts regarding the failure of the SOP'S and Method to validate each respective PE INSTRUMENT as represented, warranted, and promised; and (b) THINK20 purchased the PE INSTRUMENTS which did not have the qualities, attributes, and functionality as represented, warranted, and promised by PERKINELMER.

**132)** The failure of the PE INSTRUMENTS to validate and perform as represented and promised was a substantial factor in causing THINK20's injuries and damages.

**133)** As a direct, proximate, and foreseeable result of PERKINELMER'S afore-mentioned breach of the implied warranty of merchantability, Plaintiff

THINK20 has suffered actual out of pocket damages for purchasing the PE INSTRUMENTS at a total cost of, $2,059,598.44 damages and substantial financial and economic losses all in an amount at a minimum of not less than three million Dollars ($3,000,000.00).

WHEREFORE, THINK20 Prays for Judgment as set forth in the Prayer.

### SIXTH CAUSE OF ACTION
### RESCISSION AND RESTITUTION
### (Cal. Civ. Code §1691, et seq)
### (Against all Defendants)

**134)** Plaintiff THINK20 hereby re-alleges, refers, and incorporates by this reference, paragraphs 1 through 133 of this Complaint as though fully set forth herein.

**135)** THINK20 on February 11, 2019 and subsequently on April 3, 2019, purchased two (2) instruments, commonly known as, "Flexar-HPLC" from PERKINELMER for an approximate cost $86,722.00 for each instrument for a total sum of $173,444.00.

**136)** During the period commencing August 14, 2018 through November 21, 2018, PERKINELMER through its authorized employees made representations about the merchantability and fitness about the Flexar-HPLC to THINK20 and its representatives as set forth hereinabove in paragraph 91 and more specifically paragraphs 18(a) and 53(a), inclusive, each of which are incorporated herein in their entirety by this reference.

**137)** The representations made in paragraph 91 and more specifically paragraphs 18(a) and 53(a), inclusive, each of which are incorporated herein in their entirety by this reference, were in fact false. The true facts were as set forth in paragraph 76 & 77, each of which are incorporated herein by this reference in their entirety.

**138)** At the time of the purchase of the two (2) Flexar-HPLC instruments, THINK20 and its representatives, did not know the representations made by PERKINELMER were false, but believed them to be true and reasonably relied upon them based on the fact that, PERKINELMER is a 14-billion-dollar Fortune 500 publicly traded company successful in the medical and food testing industry and held itself out to be highly knowledgeable about the Flexar-HPLC Instrument and its applications for testing Cannabis products in various matrices.

**139)** Had THINK20 known the true facts, it would not have purchased the (2) Flexar-HPLC instruments at a total cost of, $173,444.00.

**140)** On May 31, 2019, THINK20 attempted to refuse the delivery of the second Flexar-HPLC instrument and cancel its purchase for the 2nd Flexar-HPLC being delivered to the Irvine, California lab but, PERKINELMER and GRRENBAUM convinced THINK20 not to reject the shipment and GREENBAUM promised that PERKINELMER would re-purchase the two (2) Flexar-HPLC instruments back from THINK20.

**141)** As of the date of this Complaint being files, PERKINELMER has refused to re-purchase both Flexar-HPLC instruments and refund THINK 20 the purchase price of $173,444.00.

**142)** THINK20 intends service of the summons and complaint in this action to serve as notice of rescission of the purchase of the two (2) Flexar-HPLC instruments, and hereby demands that PERKINELMER restore to THINK20 the consideration furnished by THINK20, specifically $173,444.00 with interest thereon at the legal rate from the date of the purchase for each of the two (2) Flexar-HPLC instruments.

\#

\#

**143)** For General and other damages, including out-of-pocket expenses related to the one Flexar-HPLC instrument incurred at THINK20'S Maryland Laboratory in excess of $250,000.00.

WHEREFORE, THINK20 Prays for Judgment as set forth in the Prayer.

# PRAYER

WHEREFORE, THINK20 Living LLC., prays for judgment as follows:

### FIRST CAUSE OF ACTION
### FRAUD & DECEIT-INTENTIONAL MISREPRESENTATION
### (Cal. Civ. Code §1710, et seq)
### (Against all Defendants)

**1)** For actual out of pocket damages in the minimum amount of $2,059,598.44. The exact amount to be determined at trial according to proof;

**2)** General, Compensatory and Special Damages in excess of $3,000,000.00, an exact amount to be determined at trial, according to proof;

**3)** Prejudgment Interest at the legal rate in an amount to be determined according to proof at trial;

**4)** Exemplary and punitive damages in an amount determined by the court to be reasonable as authorized by *section 3294 of the California Civil Code*;

**5)** For Costs of Suit herein incurred; and

**6)** For other and further relief that the Court considers proper.

### SECOND CAUSE OF ACTION
### FRAUD & DECEIT-NEGLIGENT MISREPRESENTATION
### (CA Civil Code §1710(2))
### (Against all Defendants)

**1)** For actual out of pocket damages in the minimum amount of $2,059,598.44. The exact amount to be determined at trial according to proof;

**2)** General, Compensatory and Special Damages in excess of $3,000,000.00, an exact amount to be determined at trial, according to proof;

**3)** Prejudgment Interest at the legal rate in an amount to be determined

according to proof at trial;

**4)** Exemplary and punitive damages in an amount determined by the court to be reasonable as authorized by *section 3294 of the California Civil Code*;

**5)** For Costs of Suit herein incurred; and

**6)** For other and further relief that the Court considers proper.

## THIRD CAUSE OF ACTION
## FRAUD & DECEIT-SUPPRESSION OF FACTS
## (CA Civil Code §1710(3))
## (Against all Defendants)

**1)** For actual out of pocket damages in the minimum amount of $2,059,598.44. The exact amount to be determined at trial according to proof;

**2)** General, Compensatory and Special Damages in excess of $3,000,000.00, an exact amount to be determined at trial, according to proof;

**3)** Prejudgment Interest at the legal rate in an amount to be determined according to proof at trial;

**4)** Exemplary and punitive damages in an amount determined by the court to be reasonable as authorized by *section 3294 of the California Civil Code*;

**5)** For Costs of Suit herein incurred; and

**6)** For other and further relief that the Court considers proper.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (Against all Defendants)

**1)** For actual out of pocket damages in the minimum amount of $2,059,598.44. The exact amount to be determined at trial according to proof;

**2)** General, Compensatory and Special Damages in excess of $3,000,000.00, an exact amount to be determined at trial, according to proof;

**3)** Prejudgment Interest at the legal rate in an amount to be determined

according to proof at trial;

**4)** For Costs of Suit herein incurred; and

**5)** For other and further relief that the Court considers proper.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE
### (Against all Defendants)

**1)** For General, Compensatory and Special Damages in excess of $3,000,000.00, an exact amount to be determined at trial, according to proof;

**2)** Prejudgment Interest at the legal rate in an amount to be determined according to proof at trial;

**3)** For Costs of Suit herein incurred; and

**4)** For other and further relief that the Court considers proper.

## SIXTH CAUSE OF ACTION
## RESCISSION AND RESTITUTION
### (Cal. Civ. Code §1691, et seq)
### (Against all Defendants)

**1)** That this Court declare the Purchase agreement of the two (2) Flexar-HPLC instruments rescinded;

**2)** That, PERKINELMER be ordered to pay to THINK20 the following sums:

    a) The consideration paid by THIK20 in the sum of, $173,444.00;

    b) Interest at the legal rate on the purchase amount from the date of payment;

**3)** That, Think20 deliver and restore possession of the two (2) Flexar-HPLC instruments to PERKINELMER;

**4)** For General and other out-of-pocket damages in an amount in a minimum amount of not less than $250,000.00, an exact amount to be determined at trial, according to proof;

**5)** For other and further relief that the Court considers proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rules of Civil Procedure Rule 38 (b), Plaintiff Think20 Labs LLC., hereby demands trial by Jury on all triable issues.

Dated: January 25, 2021      LAW OFFICE OF SUNIL A. BRAHMBHATT
A Professional Law Corporation

*/s/Sunil A. Brahmbhatt*
Sunil A. Brahmbhatt, Esq.
Attorney for Plaintiff, THINK20 LABS, LLC.